**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
DAVID STEWART (individually and on behalf of all other employees similarly situated),
           Plaintiffs.

    v.

GEORGE KALTNER (individually);
AVATAR OUTSOURCING, INC.; VOICELESS TECHNOLOGIES, INC.; SALES TECHNOLOGIES, INC. (defunct); and AVATAR TECHNOLOGIES, INC. (defunct),
           Defendants.
-----------------------------------------------------X

**CASE NO.: 1:17-cv-00565-JGK-GWG**

## Defendants' Proposed Findings of Fact

1. David Stewart was retained by Defendants at some point in late 2011 or early 2012 to provide services for a new start-up entity.
2. Stewart was initially paid approximately $2,000.00 per month which increased over time.
3. By mid-2012, individuals who were providing services for Defendants were advised that they were to become employees of the business.
4. Several individuals providing services refused to become employees of Defendants and, instead, formed their own businesses to continue providing services for Defendants as independent contractors.
5. David Stewart formed a business with Raudy Ulloa called David TPO, LLC of which Stewart had 60% ownership and Ulloa had 40%.
6. Defendants paid both Stewart and Ulloa through David TPO, LLC until at least early 2014 when Ulloa created his own entity, RU Tech, LLC and relinquished nearly all of his ownership by way of redemption to David TPO, LLC leaving himself with 1%. Ulloa later chose to provide all of his time to Defendants and was hired as a full-time employee.
7. During the time that David Stewart provided services for Defendants, he also attempted to open several other businesses, was retained by Defendant Kaltner to provide services for a foreign fast-food business being created, and otherwise evidenced a lack of exclusivity to Defendants.
8. Notwithstanding, the services to which David Stewart was retained were executive in nature. They included, but were not limited to:
    a. Managing the entire billing and collection group;
    b. Onboarding employees including assisting in the determination of wages and ensuring that new employees are provided with, and complete, all required employment documents.
    c. Interacting with clients and arranging with the implementation team to set up clients to use the services that Defendants were providing;
    d. Terminating or suggesting termination of employees.
    e. Interacting with accountants to perform taxes and accounting practices; and

  f.  Creating procedures for Defendants to use in the billing and accounting groups including the creation of the forms utilized by the entities to manage their business.

9. By mid-2014, Stewart was such an integral part of the businesses of Defendants, that he was given even greater supervisory duties.
10. By the end of 2014, Stewart was managing a team of approximately 10 staff in both the United States and in the Philippines.
11. David TPO, LLC was paid a total of $127,753.00 for the year 2014.
12. During this time, David TPO made business payments to various people and entities, including its own employees.
13. David Stewart had no formal job title, but the work provided to Defendants was akin to that of the CFO.  Indeed, even the staff believed that Stewart was the CFO for Defendants.
14. During late 2014 through early 2015, Stewart was attempting to open up new businesses for himself, including one called "United Health and Dental."
15. In early 2015, discrepancies were discovered with respect to the services provided and unaccountable funds.
16. During early 2015, Defendants retained the services of an outside contractor to investigate the discrepancies.  While this occurred, Stewart's access to the financial records was removed and he was given reduced duties – including first being made implementation manager and later office manager.
17. Notwithstanding the changes in duties, Stewart, through David TPO, LLC, continued to invoice Defendants and his pay did not change.
18. In April of 2015, a dispute arose between Stewart and Mr. Kaltner and Stewart's services were terminated.
19. The termination of services took place on or about April 15, 2015.
20. In July or August of 2015, Stewart sent communications to Kaltner making threats.
21. In August of 2015, counsel for Defendants sent Plaintiff a letter – consistent with Fed.R.Ev. 408, advising to cease and desist and attempting to resolve the disputes without filing a lawsuit – which it would do.  Stewart did not respond.
22. In November of 2015, Mr. Stewart applied for unemployment through the State of New York Department of Labor.  In his sworn application he advised that his position was "Billing Coordinator" and that he "managed all of the employees in the billing department."  He further indicated that he received payment from two entities totaling $8,000.00 per month in income.
23. Throughout 2015 and 2016, Stewart contacted numerous individuals to seek that they invest in lawsuits that he would bring against Defendants with the promise that he will repay them of upwards of 20%.
24. During this same time frame, Stewart, through his lawyers, filed an IRS whistleblower case against Defendants alleging misconduct which was due to the acts of Plaintiff himself in miscategorizing expenses and income as it was Stewart who was responsible for maintaining the books for Defendants.
25. Throughout 2016, Defendants began an investigation into the conduct of Plaintiff who appeared to be violating a non-compete agreement by opening his own competing business.

26. Beginning in mid-2016, Plaintiff began a campaign of harassment against Defendants including posting of confidential records of defendants online, making threatening calls and Facebook posts, attempting to solicit employees of Defendants, and discussing paying people to provide false testimony against Defendants. This conduct continued through October 2016.
27. In mid-2016, Defendants directed their attorneys to investigate the conduct of Stewart and other potential co-conspirators with respect to the conduct and file suit.
28. At some point in later 2016, after Defendants began preparing a lawsuit, Defendants' lawyers were contacted by Plaintiff's lawyer threatening to bring a lawsuit against Defendants under the FLSA.
29. On December 4, 2016, Defendants herein filed a 14-count complaint in the Southern District in White Plains against Stewart and others alleging violations of the Lanham Act along with other state court claims including breach of contract.
30. On January 25, 2017, Stewart filed the instant action, via a verified complaint.
31. Therein, he claimed that he was paid "an hourly wage of $52.08 and a weekly wage of $2,083.34."
32. This action was served upon Plaintiff on or about January 31.
33. On February 1, 2017, Defendants herein filed for restraints against Stewart in the Trademark Action, which was granted, barring Steward from continuing solicitation of Defendant's employees, posting confidential internal business records of Defendants on social media.
34. On February 13, 2017, Stewart filed a request for more time to respond to some unknown pleading wherein he swears "factually and sincerely" that he was working in the capacity of "billing coordinator" for 10 years with "*some* personal assistant duties" (emphasis added).
35. On April 14, 2017, Plaintiff filed an amended complaint, unverified.
36. On December 20, 2017, Plaintiff filed a second amended complaint, not verified, which made several substantive changes to the allegations, now claiming – consistent with documented evidence produced by Defendants – that he was paid flat monthly amounts.
37. Therein Plaintiff alleged "From February 1, 2012 to September 1, 2012, Mr. Stewart was paid $2,000 every month. From September 1, 2012 to July 1, 2013, he was paid $4,600 every month. From July 1, 2013 to December 1, 2013, he was paid $5,200 every month. From December 1, 2013 to February 1, 2014, he was paid $6,200 evert month." (sic) and "From February 1, 2014 to April 1, 2014, Mr. Stewart was paid $7,000 every month. From April 1, 2014 to March 1, 2015, Mr. Stewart was paid $8,000 every month. Mr. Stewart was paid $4,166.68 for the month of April 2015."

## Defendants' Proposed Conclusions of Law

### I.   Class and Collective Actions

1. The class and collective actions have not been prosecuted and are hereby dismissed, with prejudice.

### II.   David Stewart Was Not an Employee and was an Independent Contractor

3

2. In order for a party to succeed on a claim that they have been misclassified as an independent contractor, they must show that they were, as defined under the applicable standards, an employee.
3. In determining whether someone is an employee for FLSA purposes, a court employs the "economic reality" test which considers: (1) the degree of the employer's control over the worker; (2) the worker's opportunity for profit or loss and his investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business. Gustafon v. Bell Atlantic Corp., 171 F.Supp.2d. 311, 324 (S.D.N.Y. 2001) citing Brock v. Superior Case, Inc. 840 F.2d 1054, 1058–59 (2d Cir. 1988); United States v. Silk, 331 U.S. 704, 716 (1947)); McGuiggan v. CPC Int'l, Inc., 84 F.Supp.2d 470, 479 (S.D.N.Y.2000). The test is intended to be broad "so that the [provisions will] have the widest possible impact in the national economy." Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir.1984).
4. "No one factor in this common law test is dispositive and "the test is based on the totality of the circumstances." Brock, 840 F.2d at 1059. Furthermore, "[t]he ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in the business for themselves." Id; see also McGuiggan, 84 F.Supp.2d at 479 ("In short, if the Plaintiff[ ][was] in business for [himself], [he] was not [an] employee[ ]; [i]f [he] was economically dependent on and within the direct control of [the Company], [he] was [an] employee[ ]."). Finally, "[t]he existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law." Brock, 840 F.2d at 1059. After analysis of the five economic reality factors, we conclude that Gustafson was an employee within the meaning of the FLSA." Gustafon, supra, at 324-35.
5. David Stewart failed to provide any evidence of direct control over his work. He was free to work for other entities and worked on his own – or with conjunction of others - to open new businesses for economic gain.
6. David Stewart had staff, filed taxes as business after consulting with an accountant, and billed Defendants through invoices. Indeed, he reaped the benefits of owning his own business.
7. That Defendants were the bulk of his income was not dispositive as there was no clear direct control, he worked for multiple entities concurrently and received payment, and had no one clear master.
8. Therefore, the Court should find that Mr. Stewart was an independent contractor and was, therefore, not entitled to the protections of the FLSA or NYLL as a result and the Court dismisses, the Second Amended Complaint, with prejudice, as to all claims.

### III.   Even if David Stewart was Misclassified, he was an Exempt Employee

9. "[C]ertain employees, including those who are employed in 'a bona fide executive, administrative, or professional capacity', are exempt from this overtime compensation requirement." Anani v. CVS RX Servs., Inc., 788 F. Supp. 2d 55, 59 (E.D.N.Y. 2011), aff'd, 730 F.3d 146 (2d Cir. 2013). "The FLSA does not define the terms 'executive,' 'administrative,' or 'professional' for purposes of the exemption, but directs the Secretary

of Labor to do so by regulation. 29 U.S.C. § 213(a)(1). The Secretary's regulations have the force of law, and are generally given controlling weight. See Auer v. Robbins, 519 U.S. 452, 461 (1997) ('Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is ... controlling unless "plainly erroneous or inconsistent with the regulation."') (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989))." Callari v. Blackman Plumbing Supply, Inc., 988 F. Supp. 2d 261, 275–76 (E.D.N.Y. 2013).

10. "[C]ertain employees, including those who are employed in 'a bona fide executive, administrative, or professional capacity', are exempt from this overtime compensation requirement." Anani v. CVS RX Servs., Inc., 788 F. Supp. 2d 55, 59 (E.D.N.Y. 2011), aff'd, 730 F.3d 146 (2d Cir. 2013). "The FLSA does not define the terms 'executive,' 'administrative,' or 'professional' for purposes of the exemption, but directs the Secretary of Labor to do so by regulation. 29 U.S.C. § 213(a)(1). The Secretary's regulations have the force of law, and are generally given controlling weight. See Auer v. Robbins, 519 U.S. 452, 461 (1997) ('Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is ... controlling unless "plainly erroneous or inconsistent with the regulation."') (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989))." Callari v. Blackman Plumbing Supply, Inc., 988 F. Supp. 2d 261, 275–76 (E.D.N.Y. 2013).

11. "[T]he FLSA also exempts 'highly compensated employees,' defined as employees who have a "total annual compensation of at least $100,000" and who 'customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee identified in subparts B, C or D of this part.' 29 C.F.R. § 541.601(a)." Zubair v. EnTech Eng'g P.C., 808 F. Supp. 2d 592, 599 (S.D.N.Y. 2011). "Subsection (d) of the regulations provides that the highly compensated employee exemption applies only to employees whose primary duty includes performing office or non-manual work." Id.

12. "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601.

13. An "employee employed in a bona fide executive capacity" is defined as any employee: (1) compensated on a salary basis at a rate of not less than $455 per week; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a). Plaintiff solely contends that whether management was her primary duty should be a question for the jury to decide. Plaintiff's argument is without merit. Amash v. Home Depot U.S.A., Inc., 24 F. Supp. 3d 214, 218 (N.D.N.Y. 2014).

14. The evidence supports that, if David Stewart was not an independent contractor, he was, in fact, an exempt employee.

15. David Stewart had a total annual compensation of in excess of $100,000.00 per annum and as much as in excess of $120,000.00 per annum.

16. David Stewart also:

      a. Managing the entire billing and collection group;
      b. Onboarded employees including assisting in the determination of wages and ensuring that new employees are provided with, and complete, all required employment documents.
      c. Interacted with clients and arranging with the implementation team to set up clients to use the services that Defendants were providing;
      d. Terminated or suggesting termination of employees;
      e. Interacted with accountants to perform taxes and accounting practices; and
      f. Created procedures for Defendants to use in the billing and accounting groups including the creation of the forms utilized by the entities to manage their business.

17. David Stewart admitted in innumerable places, including in sworn certifications to the Department of Labor and this Court in a companion case, that he was a billing coordinator for the Defendants.
18. His subordinates at Defendants referred to David Stewart as the CFO for the Defendants and, indeed, his job duties largely matched those obligations.
19. David Stewart clearly made more than $455.00 per week as admitted in the Complaint.
20. David Stewart managed and was in charge of the billing and finance departments for Defendant.
21. David Stewart managed more than two employees.
22. David Stewart had the ability to suggest hiring or firing employees and his recommendations as to the hiring, firing, promotion and/or advancement of employees for Defendants were given considerable weight – and, indeed, he has signed documentation terminating employees showing the authority to do so.
23. Based upon these facts, David Stewart, if deemed by the Court as an employee, was an exempt employee under the FLSA and not entitled to overtime pay.
24. Therefore, the Court should dismiss count one of the Second Amended Complaint.

### IV.  **New York Labor Law**

25. The New York Labor Law "applies the same exemptions as the FLSA," the Court's analysis under the FLSA is equally applicable to NYLL claims. *Ramos v. Baldor Specialty Foods, Inc.*, 2011 WL 2565330, at *5 n. 3 (S.D.N.Y. June 16, 2011). "Indeed, [NYLL] differs from the FLSA in only one respect—to qualify for overtime exemption, an employer need not satisfy a salary test, only a duties test. *See Davis v. Lenox Hill Hosp.*, [] 2004 WL 1926087, at *5 (S.D.N.Y. Aug. 31, 2004)." *Zubair* at 600.
26. The Court, finding that David Stewart was an exempt employee pursuant to the FLSA should similarly find that David Stewart is exempt pursuant to the New York Labor Law and dismiss Count Two of the Second Amended Complaint.

### V.  **New York Wage Theft Act – Wage Notice**

27. The Wage Theft Prevention Act ("WTPA"), which became effective on April 9, 2011, amended NYLL § 195(1) to require employers to provide a written notice to employees containing specific categories of information regarding the employee's wages "at the time of hiring, and on or before February first of each subsequent year of the employee's employment with the employer." 2010 N.Y. Laws ch. 564 § 3, amending N.Y. Lab. Law §

195(1). The requirement to provide the notice "on or before February first of each subsequent year of the employee's employment with the employer" was deleted from NYLL § 195(1) as part of statutory amendments that became effective February 27, 2015 ("2015 Amendments"). See 2014 N.Y. Laws ch. 537 § 1, amending N.Y. Lab. Law § 195(1)(a).

28. The remedies under the WTPA is not retroactive.
29. Courts have read the plain language of NYLL § 198(1-b) to confer a private right of action only for time-of-hire wage notice violations, not for violations of the erstwhile annual wage notice requirement. See Sanchez, 2018 WL 4100490, at *10 (that a plaintiff cannot recover damages for violations of the annual notice requirement found in the prior version of § 195(1) "is evident from § 198 (1-b)'s language which speaks of its penalty provision being activated solely if a wage notice 'is not provided within ten business days of his or her first day of employment,' absent any reference to annual renewals") (quoting N.Y. Lab. Law § 198 (1-b)); Gamero, 272 F. Supp. 3d at 510 n.13 ("The NYLL's annual wage-notice requirement, then, was a right without a remedy. And this means that even if Plaintiffs did not receive annual wage notices on, for example, February 1, 2013, they cannot recover damages for that violation of Section 195(1)."); Yuquilema v. Manhattan's Hero Corp., No. 13 Civ. 461 (WHP) (JLC), 2014 WL 4207106, at *11 (S.D.N.Y. Aug. 20, 2014) ("Oddly, the NYLL extends this private cause of action to employees whose employer fails to provide the initial notice at hire, but not for subsequent failures to furnish the annual notice in the following years."), R & R adopted, 2014 WL 5039428 (S.D.N.Y. Sept. 30, 2014); Lin v. Benihana N.Y. Corp., No. 10 Civ. 1335 (RA) (JCF), 2012 WL 7620734, at *2 (S.D.N.Y. Oct. 23, 2012) ("The plain language of the statute ... confers a private right of action upon those who do not receive their notice at the time of hiring, but not upon those who do not receive it on or before February first of any subsequent year."), R & R adopted, 2013 WL 829098 (S.D.N.Y. Feb. 27, 2013).
30. As with the above section related to being an independent contractor, it was David Stewart who affirmatively chose to proceed as an independent contractor, fails to comport with the standard to be deemed an employee, and therefore was not required to receive wage statements with paychecks.
31. Notwithstanding, and should the Court deem Mr. Stewart an employee, among the duties to which David Stewart was required to perform was the providing of all wage notices (and other employment related forms) to all employees.
32. Equitable estoppel "'is properly invoked where the enforcement of rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.'" Veltri v. Building Serv. 32 B-J Pension Fund, 393 F.3d 318, 326 (2d Cir.2004) (quoting Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 725 (2d Cir.2001)).
33. Among the duties to which David Stewart was to perform was the providing of these employment forms to all employees and ensuring that all relevant forms were completed in the process of "onboarding" and "off-boarding" employees.
34. Defendants were justified in relying upon David Stewart, based upon the promises and obligations, to properly ensure that all employee forms were completed.
35. Had David Stewart been confident in 2012 that he was an employee and was not seeking to proceed as an independent contractor, then he was obligated to ensure that he completed

7

all appropriate forms as the *de facto* human resources for Defendants' businesses. He failed to do so.
36. It would be unjust to hold Defendants liable for the conduct of David Stewart to allow David Stewart to reap the benefits of his own failure to perform his obligations as to himself.
37. Therefore, the Court should dismiss Count 3 of the Second Amended Complaint.

## VI.     New York Wage Theft Act – Wage Statement

38. As with the obligation to provide wage notices, NYLL § 195(3) obligates employers to "furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages. For all employees who are not exempt from overtime compensation as established in the commissioner's minimum wage orders or otherwise provided by New York state law or regulation, the statement shall include the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked. For all employees paid a piece rate, the statement shall include the applicable piece rate or rates of pay and number of pieces completed at each piece rate. Upon the request of an employee, an employer shall furnish an explanation in writing of how such wages were computed."
39. As with the above section related to being an independent contractor, it was David Stewart who affirmatively chose to proceed as an independent contractor, fails to comport with the standard to be deemed an employee, and therefore was not required to receive wage statements with paychecks.
40. Similarly, and as discussed above with respect to David Stewart being estopped from obtaining relief for any purported wage notice obligation, as a result of his obligations in being the person in charge of payroll, he cannot reap the benefits of his own willful conduct in refusing to provide himself with a wage statement – especially as Defendants reasonably relied upon David Stewart setting himself as being an independent contractor and, if he was not, in providing all required documentation when he performed payroll for Defendants.
41. As a result, the Court should dismiss Count 4 of the Second Amended Complaint.

## VII.    Unjust Enrichment

42. David Stewart claims that he was misclassified on or about July 2012 or October 2012 (Second Amended Complaint at ¶¶ 28-30).
43. David Stewart does not seek equitable relief for any purported misclassification, only monetary damages. Second Amended Complaint at p. 23.
44. David Stewart filed this case on December 4, 2016 – or greater than 4 years after the purported conduct of misclassification took place.
45. "To prevail on a claim for unjust enrichment [under] New York [law], a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity

and good conscience require restitution." Beth Israel Med. Ctr. V. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 586 (2d. Cir. 2006).

46. Any claim for monetary damages arising out of a claim of unjust enrichment is subject to a 3-year statute of limitations from when the conduct took place resulting in the unjust enrichment. Don Lia v. Saporito, 909 F.Supp.2d 149, 167 (E.D.N.Y. 2012); IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 139, 879 N.Y.S.2d 355, 907 N.E.2d 268 (N.Y.2009); see also Independent Order of Foresters, 157 F.3d at 942; Cooper v. Parsky, 140 F.3d 433, 440–41 (2d Cir.1998).
47. Therefore, the unjust enrichment claims are out of time and should be dismissed, with prejudice.
48. Notwithstanding anything to the contrary, the Defendants did not benefit from any alleged misclassification and, more importantly, Stewart benefited and was not harmed by any alleged misrepresentation.
49. David Stewart utilized his position as an independent contract contractor to his benefit. As evidenced from his taxes, David Stewart wrote off nearly every expense possible – including staff, his rent, cell phone, computers, etc. It resulted in David Stewart having a final adjusted gross income in 2012 of 1,223.00 notwithstanding actual gross income of $13,421.40, in 2013 of $14,474.00 instead of the $79,261 of claimed income pursuant to his K1, gross income of $20,766.00 in 2014 of instead of $108,602 of claimed income, or a loss of greater than $5,000.00 in 2015 instead of the claimed income of $82,258 through April, 2015. Therefore, rather than be harmed, he benefitted extremely well from his conduct.
50. The testimony of Mr. Stewart's accountant, Mr. Vazquez, also weighs heavily as to Mr. Stewart's intent and knowledge. He confirmed to his accountant that he was a business and not an employee, and that the deductions being made were legitimate.
51. Similarly, equity leans in favor of the Defendants as it was Plaintiff, not Defendants who have obtained a benefit from Plaintiff being an independent contractor.
52. Finally, as with Counts 3 and 4, David Stewart was responsible for onboarding and offboarding employees and could have, at any time, fixed any apparent misclassification – he did not do so. It would be inequitable for Mr. Stewart to benefit from failing to perform duties to which he was obligated or retained to perform for the business as to himself and benefit from such conduct. Thus, he is estopped from such claims.
53. Therefore, the Court should dismiss the unjust enrichment count as being out of time. If it chooses not to do so, the Court should find that Mr. Stewart benefited and was not enriched as a result of any claimed misclassification as an independent contractor. Further, he is estopped from such claims. Thus, count five should be dismissed with prejudice.

**VIII.   Retaliation Claims – NYLL and FLSA**

54. Any retaliation claims under the FLSA are subject to the McDonnell Douglas burden shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "A prima facie case of retaliation is established by '(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" Dunn v. Sederakis, 143 F.Supp.3d 102, 109 (S.D.N.Y.,

Nov. 2, 2015) citing Mullins v. City of New York, 626 F.3d 47, 53 (2d Cir. 2010). Under the test, it is the moving party's burden to show the progs are satisfied. They cannot do so.

55. Under this three-prong test, there is not an "adverse employment action" since such an action only occurs when a party: "sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (citations and internal quotation marks omitted).

56. However, "[a]s a general matter, the Second Circuit has held that there is no bright line rule for determining 'whether the challenged employment action reaches the level of 'adverse,' and that courts must therefore 'pore over each case' to make this determination.'" Brown v. Snow, 2003 WL 1907974, at *3 (S.D.N.Y. Apr. 17, 2003).

57. The first part of the test is to show that the claims against the party seeking to enforce its right are baseless. See, e.g., Torres v. Gristede's Operating Corp., 628 F.Supp.2d 447, 466–67 (S.D.N.Y. 2008) (assertion of "baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions, even though they do not arise strictly in an employment context"). See also Chan v. Big Geyser, Inc., Slip Copy, 2018 WL 4168967 (S.D.N.Y. August 30, 2018); Flores v. Mamma Lombardis of Holbrook, Inc., 942 F. Supp. 2d 274, 279 (E.D.N.Y. 2013) (baseless counterclaims against FLSA plaintiffs "can, under certain circumstances, constitute adverse employment action sufficient to state a claim for retaliation").

58. In D'Amato v. Five Star Reporting, Inc., 80 F.Supp.3d 395 (E.D.N.Y. 2015), the trial court succinctly analyzed the standard that must be applied with respect to the determination of whether the bringing of counterclaims is retaliation to an FLSA suit. In D'Amato, the Court rejected the attempt to amend finding that the counterclaims did not rise to an actionable retaliation. Id. At 420. Analyzing the law, the Court stated:

> the Plaintiff has failed to allege any facts suggesting an "adverse employment action" as a result of the Defendants filing the counterclaims. An adverse employment action must "affect[ ] 'the terms, privileges, duration, or conditions of the plaintiff's employment.' " Ginsberg v. Valhalla Anesthesia Associates, P.C., 971 F.Supp. 144, 148 (S.D.N.Y.1997) (citing Yankelevitz v. Cornell University, No. 95 Civ. 4593(PKL), 1996 WL 447749 at *5 (S.D.N.Y. Aug. 7, 1996)). In particular, a plaintiff must show that the counterclaims had some impact on the plaintiff's employment or prospective employment. Id. ("[T]here must be some impact on [the] plaintiff's employment or prospective employment for the counterclaims to constitute an 'employment action.' "); see also Fei, 2008 WL 594768 at *3 ("But for a counterclaim to be actionable as retaliatory, it must have some impact on the plaintiff's employment or prospective employment.") (citing Kreinik v. Showbran Photo, Inc., No. 02CIV.1172(RMB)(DF), 2003 WL 22339268 (S.D.N.Y. Oct. 14, 2003)).

10

> For example, in Ginsberg v. Valhalla Anesthesia Associates, P.C., 971 F.Supp. 144, 148 (S.D.N.Y.1997), the court dismissed a plaintiff's retaliation claims because the "defendant's counterclaims relate to a simple breach of contract that does not reflect negatively on plaintiff's ethical or professional reputation." Id. The court distinguished its case from Yankelevitz v. Cornell University, No. 95 Civ. 4593(PKL), 1996 WL 447749 at *5 (S.D.N.Y. Aug. 7, 1996). In Yankelevitz, the court denied the defendant'' motion to strike the plaintiffs' retaliation claim because the counterclaims filed by the defendants alleged that the plaintiff improperly performed an audit, which "shed a negative light on plaintiff's professionalism and ethics in a profession that holds such qualities in high regard." Id.
>
> Here, as in Ginsberg v. Valhalla Anesthesia Associates, P.C., the Defendants' counterclaims related to "a simple breach of contract." 971 F.Supp. at 148. The Plaintiff does not allege any facts that could plausibly suggest that her reputation or job prospects have been affected by the Defendants' counterclaims.

59. "Whether or not an employee can claim retaliation because he or she has been sued in a well-founded lawsuit is an open question." Marchiano v. Berlamino, No. 10 CIV. 7819 LBS, 2012 WL 4215767, at *6 (S.D.N.Y. Sept. 20, 2012). Indeed, "there may be constitutional limitations on retaliation claims involving the exercise of such legal rights . . . ." Holleman v. Art Crating Inc., No. 12 CIV. 2719 VMS, 2014 WL 4907732, at *49 (E.D.N.Y. Sept. 30, 2014).
60. The other matter filed in the White Plains Courthouse is being active litigated and has been for more than three years.
61. No summary judgment motion has been sustained as to the claims therein.
62. On a motion to amend, the Plaintiff in this action alleged futility and other claims to deny the amendment which would fall under the auspices of a 12(b)(6) motion – those claims were denied.
63. There is nothing evident from the other matter that it is "baseless" and it appears, at least from the documentary evidence, that there is evidentiary support for those claims.
64. As a result, the Court cannot find that the other companion case is baseless and therefore the retaliation claims must be dismissed.
65. Similarly, the allegations of retaliation by posting allegedly derogatory statements by others have no support. They are not adverse employment actions.
66. Additionally there is absolutely no evidence that any such postings came from these Defendants.
67. Further, allegations that there was withholding pay against Plaintiff's girlfriend is without support. She has not provided testimony, no evidence has been shown, this appears to be in the Philippines not within the Court's jurisdiction, and, finally, Mr. Stewart has no standing as to this conduct.
68. There is no basis to obtain "emotional harm" or pain and suffering under the FLSA or NYLL.
69. As such, the retaliation claims should be dismissed, with prejudice.

**Conclusion**

70. The Court should dismiss all claims, with prejudice, and award counsel fees, costs, and other such relief as the Court deems just and reasonable to the Defendants.

Dated:   November 21, 2019

_____
Joshua M. Lurie, Esq.